UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------

MOZA LLC,

            Plaintiff,

    -against-

TUMI PRODUCE INTERNATIONAL CORP., *et al.*,

            Defendants.

---------------------------------------------------------

17cv1331

OPINION & ORDER

WILLIAM H. PAULEY III, Senior United States District Judge:

        Plaintiff Moza LLC ("Moza") brings this action against Defendants Tumi Produce International Corp. ("Tumi"), Catherine Bracho, William Bracho,[1] Ultra Fresh, LLC ("Ultra Fresh"), and Michael E. Felix under the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. § 499e(c)(5). Following a one-day bench trial, this Court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## BACKGROUND

        This action arises out of a dispute between two now-defunct perishable goods wholesalers—Moza and Tumi—over unpaid balances for the sale of produce.[2] Between October 4, 2016 and December 22, 2016, Moza made shipments of fruits and vegetables to Tumi worth hundreds of thousands of dollars (the "Transactions") for which it claims to have received partial or no payment. (See Am. Compl., ECF No. 70, at Ex. A.)

---

[1]     At times, this Court refers to Tumi, Catherine Bracho, and William Bracho collectively as the "Tumi Defendants."

[2]     Moza obtained a PACA license on April 4, 2016. (P-2 at 156.) Tumi received a PACA license on October 18, 2016. (See P-4 at 159.) Tumi concedes that, at all relevant times, it was subject to PACA as a commission merchant, dealer, or broker of produce. (See Answer to Am. Compl., ECF No. 81, ¶ 8.)

1

The Transactions resulted from purchase orders submitted by Michael Felix at Tumi to Moza's owner, David Martin. (Trial Tr., ECF No. 121, at 31, 150.) Once Martin received a purchase order from Felix, Moza secured the produce and sent Tumi either a bill of lading or a "passing" listing the produce aboard the shipment. (Trial Tr. at 29, 31.) Martin then created and sent an official invoice to Tumi using "FreshBooks" accounting software. (See Trial Tr. at 74, 170.) In addition to listing the produce Tumi purchased, Moza's invoices and passings: (1) were dated, (2) stated the total balance owed to Moza, (3) demanded payment within 10 days, and (4) contained the following language:

> The perishable agriculture commodities listed on this invoice are sold subject to the statutory trust authorized by section 5(c) of the Perishable Agricultural Commodities Act, 1930 (7 USC 499e(c)). The seller of these commodities retains a trust claim over these commodities, all inventories of food or other products derived from these commodities, and any receivables or proceeds from the sale of these commodities until full payment is received.

(See generally P-1 (collection of Transaction invoices and passings); see also Trial Tr. at 28.) Each passing also stated the day on which the produce shipped. (See, e.g., P-1 at 003 (Passing for Transaction 4046).) During the relevant period, Martin sent these documents to a combination of three Tumi-affiliated email addresses, usually within a day after the produce shipped. (See Trial Tr. at 29–30.)

The Transaction invoices and passings were addressed to Tumi at 3082 Decatur Avenue, Bronx, New York.[3] (See e.g., P-1 at 001.) The invoices—but not the passings—were also specifically addressed to "Mike Felix." Felix did not live at the Bronx address; rather, Felix's mother, Catherine Bracho, and his half-brother, William Bracho, lived there. (Trial Tr. at

---

[3] All but one of the Transaction invoices and passings introduced at trial were addressed to "Tumi Produce Inc."—that is, Tumi's predecessor. (See generally P-1.) Defendants, however, have not claimed that this error impacted Tumi's receipt of the invoices and passings. Indeed, both entities operated at the Bronx address. (Compare P-4 at 159 (Tumi PACA license), with P-5 at 160 (N.Y.S. Dep't of Corps., Listing for Tumi Produce Inc.).)

20.) Felix lived in Orangeburg, New York. (Trial Tr. at 20.) Tumi's PACA license listed the Bronx address as the company's mailing address and identified Catherine and William as the company's principals. (P-4 at 159.)

Tumi received an invoice or a passing—and usually both—for each Transaction. (See generally P-1; D-A–ZZ (billing documents for each Transaction).) As such, the parties focused on three disputed issues at trial: (1) whether Moza received full payment for the Transactions, (2) whether Moza properly preserved its PACA trust rights for any outstanding Transaction balances, and (3) which—if any—of Catherine Bracho, William Bracho, Felix, and Ultra Fresh is liable for Tumi's purported debt to Moza. Moza contends that each Defendant is jointly and severally liable for an outstanding balance of $222,709.93 plus interest for the 27 Transactions at issue.[4] (See Am. Compl., ECF No. 70, at Ex. A.) Moza also avers that it perfected its PACA trust rights for that balance by regularly sending Tumi invoices and passings that comport with the statute's notice requirements. (Am. Compl. ¶ 30.) Defendants dispute the balance due and maintain that Moza did not preserve its PACA trust rights because its billing practices were irregular.

## DISCUSSION

"Congress enacted PACA in 1930 to regulate the interstate sale and marketing of perishable agricultural commodities." Coosemans Specialties Inc. v. Gargiulo, 485 F.3d 701, 705 (2d Cir. 2007). Under PACA, "perishable commodities or proceeds from the sale of those commodities are held in trust by the buyer for the benefit of the unpaid seller until full payment is made." Coosemans Specialties Inc., 485 F.3d at 705; see also 7 U.S.C. § 499e(c)(2). This

---

[4] While the Amended Complaint alleges that there is a total outstanding balance of $236,912.73 plus interest, Moza has clarified that the correct balance is $222,709.93 based on: (1) an $800 credit applied to Transaction 4046 and (2) its receipt of $13,402.80 in full satisfaction of Transaction 4072. (See Trial Tr. at 26, 33.)

3

trust "is formed at the moment the produce is shipped to the buyer and remains in effect until the seller is paid in full." Ger-Nis Int'l, LLC v. FJB, Inc., 2007 WL 656851, at *1 (S.D.N.Y. Mar. 1, 2007). "To enforce payment from the trust, PACA beneficiaries may sue in an appropriate U.S. district court." Am. Banana Co. v. Republic Nat'l Bank of N.Y., N.A., 362 F.3d 33, 38 (2d Cir. 2004). To recover the proceeds from the trust, a beneficiary must establish that: "(1) the commodities sold were perishable agricultural commodities; (2) the purchaser of the perishable agricultural commodities was a commission merchant, dealer or broker; (3) the transaction occurred in interstate or foreign commerce; (4) the seller has not received full payment on the transaction; and (5) the seller preserved its trust rights by giving written notice to the purchaser within the time provided by the law." A & J Produce Corp. v. Chang, 385 F. Supp. 2d 354, 358 (S.D.N.Y. 2005); see also Double Green Produce, Inc. v. Forum Supermarket Inc., 387 F. Supp. 3d 260, 267 (E.D.N.Y. 2019); DiMare Homestead, Inc. v. Alphas Co. of N.Y., 2012 WL 1155133, at *9 (S.D.N.Y. Apr. 5, 2012).

The Transactions undeniably concerned perishable agricultural commodities sold in interstate commerce. And Tumi concedes that it was a commission merchant, dealer, or broker under PACA during the relevant period. (See Answer to Am. Compl. ¶ 8.) The parties, however, squabble over the final two elements: payment and preservation of trust rights.

I.  Whether Moza Received Full Payment

Neither Moza nor Tumi was adept at recordkeeping, and the evidence at trial was disorganized. Tasked with parsing the parties' jumbled submissions, this Court places the Transactions in several different buckets: (1) Transactions subject to inspection by the United States Department of Agriculture ("USDA"); (2) Transactions paid with cash; (3) Transactions with revised invoices for additional produce or freight charges; and (4) Transactions for which

Tumi offered no evidence of payment or did not otherwise dispute the amount charged. Two of the 27 Transactions at issue (4057 and 4076) fall into two of these categories.

### A. Produce Subject to Inspection

For eleven Transactions,[5] the produce that Tumi received was inspected by the USDA for defects. And at trial, Defendants introduced: (1) USDA inspection certificates,[6] and (2) "accounts of sale" illustrating the amounts for which Tumi resold the allegedly defective produce to third parties. (See, e.g., D-Q at 063–64 (USDA inspection certificate and accompanying account of sale for Transaction 4097).) In their post-trial submission, the Tumi Defendants claim that it is "customary" in the produce industry for a buyer to resell defective produce on the original seller's account. (Defs.' Tumi Produce Int'l Corp., Catherine and William Bracho, Proposed Findings of Fact and Conclusions of Law, ECF No. 123 ("Tumi Defs.' PFF&CL"), ¶ 14.) Stated differently, if Moza sent Tumi defective produce—so long as Tumi gave Moza the USDA inspection certificate and its account of sale—Moza would need to accept the diminished returns Tumi received upon resale of that produce as full payment. Perhaps such agreements are commonplace in the produce industry—but this Court has no way of knowing, as Defendants have not offered evidence discussing the prevalence of this purported "custom."

The only evidence Defendants offered suggesting that Moza agreed to accept diminished payments for the USDA-inspected produce is testimony from Felix specifically regarding Transaction 4056. Felix claimed that Martin gave Tumi the "OK to sell the product,

---

[5] The Transactions are: 4056, 4057, LP28USDA, LM2060USDA, LP-29, 4076, 4097, 4098, 4100, 4107, and 4119.

[6] Defendants, however, failed to introduce evidence to assist this Court in interpreting these inspection certificates, all of which contain unfamiliar terminology, such as "SER. DAM" and "CHECKSUM."

do an account of sale . . . and get it to him." (Trial Tr. at 180.) But this Court doubts the veracity of that testimony. Indeed, Felix also testified that Tumi wrote a check for $5,225 to cover Transaction 4056's total balance. (Trial Tr. at 180.) That check, according to Felix, was ultimately an overpayment because Tumi only generated $4,491.22 from its sale of the defective produce. (Trial Tr. at 180.) Yet Tumi's check to Moza is dated October 28, 2016—10 days after the last transaction listed on Tumi's account of sale. (See D-C at 009–010.) In other words, if Felix's testimony were true, it would mean Tumi willingly overpaid Moza *after* it had already sold the defective produce.

Accordingly—to the extent it has not paid the full amounts due—Tumi owes Moza the remaining balances for these eleven Transactions. Cf. Belleza Fruit, Inc. v. Suffolk Banana Co., Inc., 2012 WL 2675066, at *8 n.6 (E.D.N.Y. July 5, 2012) ("[W]hether the parties agreed to a discounted price based upon the quality of the produce delivered, or whether defendants unilaterally decided to pay a discounted price based upon the quality of the produce . . . [is an] issue . . . appropriately left to the finder of fact after a trial on the merits."). This Court reaches the same conclusion for Transaction 4046, for which Felix testified that Moza agreed to accept a diminished sum following an "in-house" inspection. (Trial Tr. at 178–79.) To be sure, Martin did not accept the results of that inspection. (See Trial Tr. at 72.)

B. Transactions Paid with Cash

For Transactions 4076 and 4088, Defendants contend that Moza agreed to accept cash payments in full satisfaction of the amounts to which Moza claims it is entitled. The invoices introduced at trial for these Transactions (1) state the amount that Moza allegedly agreed to accept in cash, and (2) are dated and hand-signed by Felix, Martin, and a Tumi employee named "Frankie." (See D-L at 046; D-P at 056.) Martin testified that his signature on

6

these documents was forged, Trial Tr. at 131, 134, while Felix claimed to have seen Martin sign them, Trial Tr. at 187.  This Court observes that while Martin's purported signature on these invoices resembles his undisputed signature on certain endorsed checks, compare D-L at 046, with D-F at 025; see also Trial Tr. at 141, his signature—a circle next to a horizontal line—is not difficult to duplicate.  This Court credits Martin's testimony on this point.  Accordingly, to the extent that Tumi has not paid for Transactions 4076 and 4088 in full, the outstanding balances are due.

### C. Revised Invoices with Added Produce or Freight Charges

For Transactions LM2058 and LM2059, Moza sent Tumi "revised" invoices that increased the amount of produce listed thereon and, in turn, increased the total balance.  (See P-1 at 061, 063, 067.)  Martin testified that Moza was initially misinformed about what produce was shipped to Tumi.  (See Trial Tr. at 103–05 ("The bill of lading was not received, and we were incorrectly invoiced.  And I had the e-mail thread that went from the person who sold it to me showing that they wrongly invoiced me.").)  After realizing that Tumi had only been billed for a portion of what it received, Martin claimed he sent out revised invoices.  (See Trial Tr. at 103–05.)  This Court credits Martin's testimony on Transaction LM2058, which is corroborated by a bill of lading confirming that Tumi received more produce than initially invoiced.  (P-1 at 064.)  This Court also credits Martin's testimony on Transaction LM2059 because Defendants do not argue that Tumi did not receive the additional produce.[7]  Accordingly, to the extent that Tumi has not paid the full amounts due for these Transactions a balance remains.

For Transactions 4057 and 4067, Moza issued revised invoices that contained freight charges.  (See P-1 at 012 (4057), 016 (4067).)  Similarly, for Transaction 4069, Moza

---

[7] At trial, counsel for the Tumi Defendants merely noted that the invoice is absent from Tumi's records and that Moza did not offer affirmative proof showing that it sent the invoice to Tumi.  (Trial Tr. at 105.)

7

contends that it is owed a freight charge of $6,100 even though it has not produced an invoice or a passing with that charge listed. (Cf. Trial Tr. at 167.) While it appears that Moza did occasionally bill Tumi for freight in connection with the Transactions, see, e.g., P-1 at 001 (invoice for Transaction 4046 with freight charge), Moza has not offered evidence showing that Tumi agreed to accept freight for these specific transactions. Accordingly, these charges are deducted from Tumi's outstanding balances.

D. Transactions for which Tumi has Offered No Evidence of Payment

For the following transactions, Tumi introduced no evidence indicating that it paid Moza or otherwise disputed the amounts charged: LM2063, 4066,[8] 4084USDA, 4101, 4102, 4105, 4108, 4110, and 4112. Any outstanding balances therefore remain due.

E. Total Outstanding Balance

This Court has crunched the numbers and—in light of the above conclusions—finds that Moza is owed outstanding balances for the following Transactions, some of which are necessarily grouped together because Tumi occasionally paid multiple invoices with a single check or wire transfer:

| Transaction Number | Amount Outstanding |
|---|---|
| 4046 and LM2058 | $14,745.85 |
| 4056 | $4,197.00 |
| 4057 and 4067[9] | $2,160.00 |
| LP28USDA | $318.00 |
| LM2059, 2060USDA, and 4097 | $12,487.80 |
| 4066 | $4,988.60 |
| 4069 | $750.00 |

---

[8] At trial, counsel for the Tumi Defendants observed that the amount billed on a revised invoice for Transaction 4066—upon which Moza bases its claim—is more than the amount stated on an earlier invoice and passing. (Trial Tr. at 109.) There is no dispute, however, that Tumi received this revised invoice from Moza. (See D-I at 027.) And Defendants have not argued that Moza overbilled Tumi for this Transaction.

[9] Although this Court concludes that Moza cannot collect on the additional freight charges imposed via its revised invoices for Transactions 4057 and 4067, Tumi still has not paid the full amounts due for the original outstanding balances. The same is true of Transaction 4069.

| | |
|---|---|
| 4076 | $30,529.00 |
| LM2063 | $22,285.00 |
| LP-29 | $11,561.75 |
| 4084USDA | $14,580.00 |
| 4088 | $17,573.90 |
| 4098 | $6,837.50 |
| 4100 | $8,553.00 |
| 4101 | $8,791.90 |
| 4102 | $8,962.00 |
| 4105 | $8,815.00 |
| 4107 | $8,425.00 |
| 4108 | $8,935.43 |
| 4110 | $4,675.00 |
| 4112 | $9,925.00 |
| 4119 | $8,825.00 |
| | **$218,921.73** |

II.    <u>Whether Moza Preserved Its PACA Trust Rights</u>

Since Moza has not received full payment on the Transactions, the next step is to determine whether Moza preserved its PACA trust rights for those balances. This Court concludes that it has.

"Complying with the PACA notice requirements is 'an absolute precondition to pursuing trust assets held by a [PACA trustee].'" DiMare Homestead, Inc., 2012 WL 1155133, at *9 (alteration in original) (quoting D.M. Rothman & Co. v. Korea Commercial Bank of N.Y., 411 F.3d 90, 96 (2d Cir. 2005)). Under PACA, a plaintiff may provide notice in one of two ways: (1) a written notice of its intent to preserve its trust rights within thirty calendar days after payment was due (the "written notice method"), or (2) a printed statement on its "ordinary and usual billing or invoice statements" (the "invoice method"). 7 U.S.C. § 499e(c)(3)–(4); see also A & J Produce Corp., 385 F. Supp. 2d at 361. The invoice method is available only to PACA licensees. See 7 U.S.C. § 499e(c)(4).

Moza—a PACA licensee during the relevant period—relied exclusively on the invoice method, for which there are three requirements. First, the billing statement or invoice

must be "ordinary and usual," which the relevant regulations define as "communications customarily used between parties to a transaction in perishable agricultural commodities in whatever form, documentary or electronic, for billing or invoicing purposes." 7 C.F.R. § 46.46(a)(5). Second, "[w]hen the parties expressly agree to a payment time period different from that established by the [regulations]," that payment time period must be disclosed on the billing statement or invoice. 7 U.S.C. § 499e(c)(3)–(4). The default payment period under the regulations is "10 days after the day on which the produce is accepted." 7 C.F.R. § 46.2(aa)(5). "Parties who elect to use different times for payment must reduce their agreement to writing before entering into the transaction." 7 C.F.R. § 46.46(e)(1). And "[t]he maximum time period for a shipment to which a seller . . . can agree, prior to the transaction, and still be eligible for benefits under the trust is 30 days after receipt and acceptance of the commodities." 7 C.F.R. § 46.46(e)(2). Finally, the billing statement or invoice must contain the following language:

> The perishable agricultural commodities listed on this invoice are sold subject to the statutory trust authorized by section 5(c) of the Perishable Agricultural Commodities Act, 1930 (7 U.S.C. 499e(c)). The seller of these commodities retains a trust claim over these commodities, all inventories of food or other products derived from these commodities, and any receivables or proceeds from the sale of these commodities until full payment is received.

7 U.S.C. § 499e(c)(4).

Each of Moza's invoices (and its passings) contained the requisite statutory language and called for payment within 10 days. (See generally P-1.) Presumably in light of these facts, Defendants spent the bulk of trial attempting to show that Martin could not prove when Moza created and sent Tumi its invoices. (See, e.g., Trial Tr. at 74 ("Q. Nothing indicating that that invoice was sent at the time of the sales, correct? A. On that page? No.").) In an attempt to capitalize on this testimony, the Tumi Defendants contend in their post-trial submission that "[m]any of [Moza's] invoices" are not "ordinary" or "usual" as required by the

10

statute because they were "created more than 40 days after delivery and contained back-dated and conflicting information."[10] (Tumi Defs.' PFF&CL ¶ 44.) This argument lacks merit. Moza was "not required to show delivery of the invoices beyond a metaphysical doubt," In re Alvarado, 2018 WL 1354512, at *7 (Bankr. C.D. Cal. Mar. 14, 2018), and Martin testified that Moza typically delivered its passings and invoices to Tumi within a day after the produce shipped. (Trial Tr. at 29.)

Moreover, while Martin created and sent the passings to Tumi, he created the invoices using FreshBooks. (Trial Tr. at 170–71.) Once created, Martin sent the invoices to Tumi through FreshBooks. (See Trial Tr. at 74, 105.) And since FreshBooks sent the invoices to Tumi from its servers, Martin clarified that he was often left without confirmatory proof of their ultimate delivery to Tumi. (See Trial Tr. at 105 ("Q. All right. Show me where it says you sent the invoice. A. Those are automatically sent out by Fresh Books. I can't account for Fresh Books' server. I'm not an employee of Fresh Books, so I wouldn't have access to Fresh Book's server information.").) For this reason, Martin usually sent the invoices and passings separately and included the PACA trust language on both documents. (Trial Tr. at 74.)

Despite Defendants' efforts to undermine Martin's testimony, this Court concludes that it is generally credible for several reasons. First—as Defendants' exhibits demonstrate—Tumi viewed and printed at least some of the Transaction invoices directly from

---

[10] As best as this Court can tell, the Tumi Defendants' suggestion that "40 days after delivery" is the relevant cutoff for when Moza needed to send its invoices to Tumi is rooted in PACA's requirement that an unpaid seller "give[] written notice of intent to preserve the benefits of the trust . . . within thirty calendar days . . . after expiration of the time prescribed by which payment must be made." 7 U.S.C. § 499e(c)(3). While this requirement is listed within the PACA provision concerning the written notice method, it is absent from the provision concerning the invoice method. See 7 U.S.C. § 499e(c)(4). The parties have not directed this Court to any authority—and this Court is unaware of any within this circuit—discussing whether the 30-day post-expiration cutoff is properly read into the requirements for the invoice method. Although this argument was raised in DiMare Homestead, 2012 WL 1155133, at *11—a case cited heavily by the Tumi Defendants—the court did not discuss the validity of that argument in reaching its decision. In any event, and as noted above, this Court credits Martin's testimony concerning the delivery of Moza's invoices to Tumi.

11

FreshBooks' website. (See, e.g., D-I at 027 (FreshBooks printout for Transaction 4066).) Second, nearly all of the Transaction invoices introduced at trial include a footer stating: "This invoice was sent using FreshBooks." (See, e.g., D-E at 022 (invoice for Transaction 4066).) Finally, while Moza did not introduce passings for every Transaction, the passings that it did introduce include a produce shipping date that either matches or is only a few days apart from the date of the corresponding FreshBooks invoice. (Compare P-1 at 135 (passing for Transaction 4105 dated December 10, 2016), with D-V at 088 (invoice for Transaction 4105 dated December 10, 2016).)

With that said, Martin's testimony concerning Moza's revised invoices for Transactions 2058 and 2059 warrants separate analysis. These two transactions originated from a single purchase order but were then split at Felix's request. (P-1, at 059.) As previously noted, Martin testified that for both Transactions, Moza was misinformed about the amount of produce shipped to Tumi, thereby resulting in Tumi receiving more produce than for which it was originally invoiced. Moza's corrected invoices for these Transactions therefore call for increased payment to correspond with the produce that Tumi received. During Martin's cross-examination, counsel for the Tumi Defendants indicated that Moza had not preserved its PACA trust rights to the increased amounts because: (1) Moza failed to proffer evidence showing that Moza sent the revisions to Tumi, and (2) both the original and revised invoices for Transaction 2058 are dated October 21, 2016. (See Trial Tr. at 96–107.)

Moza introduced the bill of lading for Transaction 2058, which shows the correct amount of produce aboard the shipment and is dated October 21, 2016. (P-1 at 064.) On December 8, 2016, Tumi wired $22,317.05 to Moza—$9,256.05 of which was intended to pay for Transaction 2058. (D-G at 033; Trial Tr. at 98.) Martin testified that on December 9, 2016,

12

he emailed an invoice to Tumi: (1) showing an overall charge of $17,945.90, (2) reflecting the $9,256.05 payment, and (3) showing a remaining balance of $8,690.85. (Trial Tr. at 98.) In their post-trial submission, the Tumi Defendants suggest that Martin's December 9, 2016 email was the <u>first time</u> Tumi received an invoice showing the $17,945.90 charge. (Tumi Defs.' PFF&CL, at 5.) This position, however, misinterprets Martin's testimony. Indeed, Martin explained that he first sent Tumi the revised invoice for Transaction 2058 <u>immediately</u> after receiving the bill of lading. (Trial Tr. at 103.) Again, this Court finds no reason to discredit Martin's testimony, and, as such, it concludes that Moza preserved its PACA trust rights to the full $17,945.90. The same is true for Transaction 2059, for which Martin testified that Moza used "the same shipper . . . with the same . . . problem as" Transaction 2058. (Trial Tr. at 105.)[11]

Accordingly, Moza preserved its PACA trust rights for the full outstanding balance of $218,921.73.

III. Defendants' Liability

"An individual who is in a position to control the assets of the PACA trust and fails to preserve them, may be held personally liable to the trust beneficiaries for breach of fiduciary duty." Coosemans, 485 F.3d at 705. "A court considering the liability of the individual may look at the closely-held nature of the corporation, the individual's active management role and any evidence of the individual's acting for the corporation." Top Banana, L.L.C. v. Dom's Wholesale & Retail Ctr., Inc., 2007 WL 2746810, at *3 (S.D.N.Y. Sept. 19, 2007) (internal quotations marks and citations omitted).

---

[11] This Court notes that, for Transaction 4056, Moza sent a revised invoice to Tumi that decreased the amount owed. Indeed, Moza's initial invoice states a total charge of $10,442, but its revised invoice states a total charge of $9,422. (P-1 at 007–009.) To the extent that Defendants contend Moza somehow forfeited its PACA trust rights by issuing the revised invoice, this Court disagrees. Martin testified that the invoice "could have been amended . . . [within] a couple days" or that "[i]t could have been [within] one day." (Trial Tr. at 75.)

13

Here, Moza avers that Catherine Bracho, William Bracho, and Felix were able to control PACA trust assets. Similarly, Moza claims that Ultra Fresh is liable for Tumi's debt because it "assumed and continued [Tumi's] business" after its dissolution. (Am. Compl. ¶ 57.)

A. Catherine Bracho

In a March 11, 2019 letter to this Court, Catherine Bracho conceded that she controlled Tumi's finances. (ECF No. 108 (Mar. 11, 2019 Ltr.)) But even ignoring this concession, the record is replete with evidence demonstrating that Catherine controlled Tumi's purse strings. Indeed, during the relevant period, only Catherine signed Tumi's checks to Moza. (Trial Tr. at 52–53.) Moreover, Catherine is the lone "sender" on each of Tumi's wire transfers to Moza. (See generally D-A, D-B, D-K.) Tumi's PACA license states that Catherine is a principal of the company, and it also lists her home address as the company's mailing address. (P-4 at 159.) Accordingly, Catherine is personally liable for Tumi's debt to Moza. See A & J Produce Corp. v. Borough Park Food Mart LLC, 2018 WL 566458, at *3 (S.D.N.Y. Jan. 25, 2018) (holding that individual defendants "were indisputably in positions of control of [the company]" because they "were officers or directors of [the company], had check-signing authority, exercised management duties over employees, and made business decisions on the company's behalf" (quotation marks omitted)); DiMare Homestead, Inc., 2012 WL 1155133, at *14 (holding individual defendants liable where they were "officers and shareholders of [the company], signatories on its corporate bank accounts, and listed as 'Principals' on its PACA license").

B. Michael E. Felix

This Court also concludes that Felix is personally liable for Tumi's dissipation of PACA trust assets. Felix engaged in considerable business with Moza. He submitted every

14

purchase order for the Transactions and was in near-constant contact with Martin. (Trial Tr. at 40–41, 43.) In fact, Martin believed Felix owned Tumi and was involved in "everything from A to Z," including paying invoices. (Trial Tr. at 41, 46.) The only responsibility that Martin believed Felix did not have was "writing the checks physically." (Trial Tr. at 46.) Conversely, Felix maintains that he was merely a salesman and produce buyer at Tumi. (Trial Tr. at 185.) He testified that he was never a Tumi officer, director, or shareholder, and he did not have the authority to make withdrawals from Tumi's bank account, write checks, or wire money. (Trial Tr. at 185–86.) Felix was not a principal on Tumi's PACA license, and he did not live at the address listed as Tumi's mailing address. And Tumi introduced exhibits arguably hinting that Felix's official title at Tumi was "salesman." (See D-BB, at 099 (Invoice from Tumi to Moza).)

        Nonetheless, this Court finds that there is ample evidence demonstrating Felix's control over Tumi's business. In reaching this conclusion, this Court again observes a gap in Felix's testimony. At trial, Felix described himself as little more than a cog in the wheel in assessing Tumi's outstanding debts. (Trial Tr. at 196 ("All the files would go into the office manager, which was Dorothy. Once the folder came in . . . I would look at it and I'd say, OK, it's good. Dorothy would take it, go over it, make sure, examine it, and then give it to Mrs. Bracho for payment.").) He also claimed to have "never told Mr. Martin" when to pick up checks from Catherine. (Trial Tr. at 197.) Instead, "once she okayed the check, she would call [Felix]" who would then "tell Moza to come pick it up." (Trial Tr. at 198.)

        The documentary evidence and Martin's testimony paint a different picture. Martin explained that whenever Catherine wrote Moza a shorted check, she would instruct him "to talk to Mike; that's between you and Mike; I just write the check." (Trial Tr. at 24–25.) A string of text messages from January 2017 corroborates that testimony. Indeed, on January 11,

15

2017, Martin texted Felix requesting that he pay Tumi's outstanding invoices. Felix replied that Moza would "not be getting all [the requested balances]," and that "if [Martin] want[ed] [a] check" he could "pick one up in two hours" from Catherine. (P-11.) Felix even listed for Martin the precise Transaction numbers that Tumi intended to pay at that time. (P-11.) Accordingly, this Court concludes that Felix possessed sufficient authority to direct the flow of Tumi's funds. See "R" Best Produce, Inc. v. Eastside Food Plaza, Inc., 2003 WL 22231577, at *7 (S.D.N.Y. Sept. 30, 2003) (concluding that defendant was individually liable because—among other reasons—defendant was "the person who create[d] orders for produce and the person who review[ed] all invoices for purchases and decide[d] which invoices to pay," and "was [also] the person who ordered the produce at issue in th[e] case, acknowledged receipt of such produce, and accepted it"); Loi Banana Corp. of Brooklyn v. Cent. Brooklyn Produce Wholesalers & Comm'n Merchs., Inc., 1996 WL 391574, at *2 (E.D.N.Y. July 10, 1996) (rejecting argument that defendant was merely a "'silent partner' and did not run the 'day-to-day' operations" because it was "wholly unsupported by [the] available evidence").

C. William Bracho

William, however, is not personally liable to Moza. To begin, this Court observes that Moza omitted all substantive references to William in its post-trial submission, and he is not included among the Defendants against whom Moza seeks judgment. (Pl.'s Proposed Findings of Fact and Conclusions of Law, ECF No. 129, at 24.) And, in any event, the only evidence Moza has offered to demonstrate William's ability to control Tumi's finances is: (1) his name on Tumi's PACA license, (2) the fact that he owned 90% of Tumi's voting shares in 2016 and 2017, and (3) his connection to a generic email address where Martin sometimes sent invoices and passings—"tumiproduce@gmail.com." Moza, however, has offered no evidence demonstrating

16

his involvement in Tumi's business. And without more, this Court declines to find that William is personally liable for Tumi's debt. Indeed, while "courts have found individuals personally liable under PACA based solely on that individual's status as a sole shareholder, owner, officer or director of a PACA debtor corporation, in cases involving multiple officers or shareholders, conclusory and undetailed allegations of control by individuals over PACA trust assets are insufficient to plausibly suggest personal liability." Hop Hing Produces Inc. v. X & L Supermarket, Inc., 2013 WL 1232948, at *10 (E.D.N.Y. Mar. 26, 2013); see also In re Maxsun Produce Corp. PACA Litig., 2013 WL 795973, at *5 (S.D.N.Y. Mar. 4, 2013) ("[T]he question turns not on whether the individual nominally held an officer position nor even the size of his or her shareholding, and each case depends on facts found by the trier." (quotation marks omitted)).

D. Ultra Fresh

Moza also seeks to hold Ultra Fresh liable for Tumi's debt on the theory that Ultra Fresh "assumed and continued [Tumi's] business" following its dissolution. (Am. Compl. ¶ 57.) In determining whether continuation of a predecessor's business has occurred, courts consider "(1) continuity of ownership; (2) cessation of ordinary business by the predecessor; (3) assumption by the successor of liabilities ordinarily necessary for continuation of the predecessor's business; and (4) continuity of management personnel, physical location, assets, and general business operation." Nettis v. Levitt, 241 F.3d 186, 193–94 (2d Cir. 2001) (per curiam), overruled on other grounds by Slayton v. Am. Express Co., 460 F.3d 215 (2d Cir. 2006). "Aside from continuity of ownership—the sine qua non of a merger—not all hallmarks . . . need be shown." Moza LLC v. Tumi Produce Int'l, 2018 WL 2192188, at *4 (S.D.N.Y. May 14, 2018). Here, Moza has not shown any of the hallmarks of continuation. Moza did not discuss Ultra Fresh in its case in chief, and its sole piece of evidence concerning Ultra Fresh's

17

ownership is the company's PACA license, which states that Felix's ex-brother-in-law, William Hidalgo, is the company's principal. (P-7 at 164.) Accordingly, Moza's claim against Ultra Fresh is dismissed.

IV. Interest

Finally, this Court briefly addresses Moza's claim that it is entitled to prejudgment interest for Tumi's outstanding balances. "PACA does not provide for the award of prejudgment interest, and under federal law such an award rests on the [c]ourt's discretion." E. Armata, Inc. v. Platinum Funding Corp., 887 F. Supp. 590, 595 (S.D.N.Y.1995). "However, the purchaser is required to pay such items when the parties' contract so provides; in such a case, the interest and collection costs become subject to the PACA trust together with the principal debt." Dayoub Mktg., Inc. v. S.K. Produce Corp., 2005 WL 3006032, at *4 (S.D.N.Y. Nov. 9, 2005). "Thus, the pivotal question is whether the parties' contract provides for an award of interest and collection costs in favor of" Moza. Dayoub Mktg., Inc., 2005 WL 3006032, at *4. Moza's passings and invoices do not provide for interest on outstanding balances. Accordingly, this Court declines to grant Moza prejudgment interest.

## CONCLUSION

For the foregoing reasons, this Court awards Moza LLC judgment in the amount of $218,921.73 against Defendants Tumi Produce International Corp., Catherine Bracho, and Michael E. Felix. The Clerk of Court is directed to mark this case closed.

Dated: September 16, 2019
    New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.